I wonder if the attorneys would stand up and let us know who you are. Mr. Driscoll, you have 15 minutes to address the court in argument. You can save out of that 15 any portion you wish for response. May it please the court, again Kevin Driscoll appearing before Michael Fernando, the appellant here. Mr. Fernando is a doctor. He graduated from medical school and went to work for Youth Empire Services, which we refer to as YES in the briefs. YES is a social service that provides psychiatric and other help to children at risk. It's connected with DCFS. Dr. Fernando was a psychiatrist and took this job out of medical school. A woman named Naomi Jennings owned the clinic. As we discussed in our brief, Dr. Fernando never owned any part of YES and was an employee. He went about his business and did his work, treating at-risk kids. And then, as the state does, since this is part of the Medicaid program, they sent an auditor out to look at the books and records of YES. A woman named Hope Little came out and looked. You mentioned in your very first argument that the administrative law judge committed error in holding that your client was solely liable for the criminal wrongdoing of the criminal Naomi Jennings. That's correct, Judge. Eventually Ms. Jennings was entitled. This wasn't a criminal case. This was a civil recovery case. Correct, Judge. Correct, Judge. The criminal aspect of it is, I think, to frame the argument. We understand the criminal aspect of it. This was an action by the department to recover money. Correct, Judge. Was this audit then a random audit? It is a random audit, Judge. They come in and look at a certain amount of the records. They find mistakes in there. But you suggested somehow, I thought, that he turned this woman in or something. He did, Judge. For the criminal proceeding, there was an investigation. He cooperated with the police, testified at her criminal trial. But did the audit originate because of his calling someone? I don't know what happened. Something happened and he actually went to the press and said that he thought there was a mistake in there. I don't know exactly how... But did the audit occur before she was obviously indicted, I would think. The audit occurred before she was indicted. Yes. Yes. But the fact that she was an indicted criminal, Judge, it doesn't get him out of his case. And I agree with you on that point. But it does, I think, give us a framework on how we're looking at this issue. What would you suggest the department do to take into consideration her criminal liability? Well, it comes into play... I mean, they were jointly and severally liable under the contract, right? Only if you have a valid alternate APA agreement, the alternate pay agreement, Judge. And the heart of our argument is that there's not a valid APA here. Where's the statute require that there be a valid APA? The regulations require that for another party to submit a bill on a doctor's behalf, there has to be an APA. Otherwise, that party has no... What regulation directed to me? Because I couldn't find it and I don't... Well, we can start with Section 140.25, Judge. Is it in your mind? It is in my mind. It's a brief in appendix. There's actually two provisions, and you raise a good point here, it's changed, actually. SA-23 is the old provision and SA-24 is the new provision. And it says that... If you look at 140.25, that talks about the provider of... You just said SA-23. So where is the language that you're relying on? That's the provision that we talk about here. And I'll direct you more focused on the second sentence of Paragraph A that says, the department shall recover overpayments made to a provider. Okay. We never had any payments made to a provider here. The payments were made to, yes, Dr. Fernando didn't submit these bills, he didn't get paid. Now, he could have, had there been a valid APA, he could have assigned his rights to her. Actually, what I was looking for was you said that somewhere in here, there's a requirement that a valid APA be executed in order to recover overpayments. Where is that provision? That's what I'm looking for. Statutory regulation. I don't think there is one, Judge, because absent the APA, it's a party taking an action of mine. So there is no requirement that a valid APA be executed in order for the department to seek overpayments. Correct, Judge. Okay. But if you look, I mean, if we look at 140.25, you can look here, I mean, the original provision says, the department shall recover overpayments made to a provider. Okay. That's the statute that was in effect at the time we were litigating this case, the time that these overpayments occurred. Yeah. And then if you look at the provision that was put into effect in 2007, which is SA-24, it says, payments made to a provider or on his behalf. So that, they brought in a section that talks about, you know, maybe it's not going directly to the provider. You argue, one, he's not a provider, but then you argue if he is a provider. No, he's a provider. He's a provider. He didn't get the payments. The provider's a doctor who provides, or somebody who provides medical services. He did that. And we're not disputing that the bills were incorrect, Judge. Fortunately, that's not an issue that we're arguing here. No. But, you know, if you look at this APA, which is the, what, it's a document that, you know, allowed, yes, to submit bills on Fernando's behalf. The state, in the trial below, we had brought a motion to bring Jennings into the case. And eventually she was allowed to be subpoenaed. She came in as a subpoena witness. And you were able to ask her whatever you wanted. Yes, Judge. All right. As a witness, not as a party. But the important thing, there's some difference in terms of your availability of what you could ask. I don't recall any evidentiary rule that would limit cross-examination because the party, the person is designated a party versus, what did you say, a witness? She was a subpoenaed witness, Judge. I don't know of any limit on cross-examination that there is or exists for parties versus witnesses. Do you? Well, Judge, that's a good point. And we raised the fact that her not being come in was due diligence. Before I get to that point, and it's a good one, I want to address it. But I would like to say that the state argued that this APA was invalid. Okay? They made that argument before. They said that it was invalid and it was no good. And if I could just back that up into another example for the Court to consider. I mean, I send money to a borrower. I lend them $100 and we sign a note and it's one of those deals where you get the free toaster. This is a silly example, but I think it's going to ring true. And say that the borrower defaults on this note and I sue him for the $100. And let's say he brings a claim against me and says, well, hey, I never got my toaster. I'm going to bring a claim against you for my toaster. And assume that we litigate this and I'm suing him for the money. And I say, well, he can't bring that claim against me because that note's invalid. You know, it's not enforceable because of X, Y, or Z. And so, therefore, he can't get his toaster. I can't very well turn around and then say, but, by the way, I want my money. And that's what the state's done here. The reason they can catch him for the liability is because he gave his right to bill to the doctor or to YES. He gave that to the ultimate payee agreement. Absent that, YES never would have any right to submit bills on SPF. There would have been naked. There would have been no formal authorization from the doctor to YES to put those bills in. And they said at the trial below that the APA was invalid. So how can they very well say that it's invalid in that sense, but then at the same time say that it's valid to assert liability against him? It's a classic case of estoppel. They took a position. They said that the APA was invalid because YES didn't meet the requirements. And then they won on that position to get a tactical advantage for whatever reason. I was involved in the case at that point. But they didn't want Naomi Jennings coming in as a part of it. And so they fought it. And they won on that point. And so we brought Jennings in as a witness. But my point is that the APA, they said it was invalid. So if there's no valid APA, there's no standing against Fernando for the bills. What more would you have done had she been a party versus a subpoenaed witness? Well, Judge, I was just thinking out loud here. She never was brought in. But she was there. You were able to ask her any question you wanted. She was there. So what more would you have done? Well, she would have been a party. So parties are under a different obligation, I think, to a court than a witness. Perhaps if the doctor wanted to, he could have brought some kind of claim against her for contribution in that court. Well, I don't know that a claim for contribution would lie in an administrative hearing. But you certainly aren't prevented from doing that outside of these proceedings. Correct, Judge. And for reasons which I can't get into, the doctor didn't do that. But moving past this APA agreement, even to the extent that it's, if you look at the facts, which I don't think are in dispute, the facts are that this yes entity wasn't a proper entity for an APA agreement. It wasn't a hospital. It wasn't a group practice. There's a list of things that it has to be for the APA to be valid. And additionally, for that, the... Well, then could the doctor be doing what he was doing in the first instance, assigning the right for them to bill if they weren't eligible? I think, Judge, I think what should have happened is the bills never should have gone out. Well, could the doctor then have done what he did in the first instance under your scenario? I suppose he could have done it, but it would have been a nullity because... Well, he had his provider number. He had his provider number, and that's what he's assigned by the APA. He's letting somebody else use his number. It's like giving your kid a credit card. He was aware of that. Yeah. Yeah, he was. But secondly, if you read the APA... Doesn't the code require him as the individual practitioner as having the ultimate responsibility to maintain and produce any records at any time? Yeah, he has a duty to produce records. Yeah, who has the duty to maintain the patient records? Well, I think it's dual, Judge. I think it's both on the provider and the hospital. I mean, you would agree that a doctor has the duty to keep patient records, isn't he? Yes. And isn't part of this case a failure to produce patient records? Yes, Judge. Some of the... In fact, I would hazard to guess that a lot of the damages out of this case were because there were no records at all. Okay. And there was 3,474 instances of unauthorized billing? Correct. For unauthorized services? Yes. Some was no records. Some was people billing for services that shouldn't have been billed, and some was, I think, billing too much for services. So those are the three general areas which the damages came from. But doesn't the doctor state in some type of information to yes as to what he was billing for? He would just submit his records. He talked about that at the trial below. He would just submit his records in, and then yes would turn the doctor's... I pretend that we disregard that? Yeah. Okay. Is it this? Yes. What we need is a tornado drill, but this isn't a tornado drill. He testified. He turned an equivalent of what his time sheet would be, Judge, whatever doctor's call goes into the billing, and then Jennings and yes had a third party which turned those into bills which then went to the state is, I believe, how it played out. So admittedly, he does have a duty to do records, and there were missing records. But that doesn't give you direct liability action for the money that's done here. That's for the bills. And without a valid APA, the bills are not valid. Well, I think under their rules, if you don't produce patient records, they take the position that it never happened. They don't have a patient to be able to verify that the service was rendered. I'm not sure I'd be willing to go that far, Judge. I'm willing to admit that there is an issue if the provider can't produce records. No dispute there. Now, what happens if there's no records? It's a different issue than a bill being sent for payment that has improper billing on its face, which is what's happened here, which is the basis of liability. This is just improper billing is what you're contending. Exactly, Judge. And furthermore, there was supposed to be a power of attorney, which the state never produced, which is a companion to this APA, which the power of attorney has to go to the state before the bill should be issued. He had his own contract with the state. He signed the typical things that physicians sign. Yeah, and it said in that agreement, the provider agrees to be fully liable for the truth, accuracy, and completeness of all claims submitted electronically. Yeah, and oftentimes, Judge, look at that language. Now, it doesn't say anything about whether or not he provided or whether the claims were submitted electronically by somebody other than him. It says that he's liable for the truth and accuracy and completeness of his claims. That's his agreement with the state. It had nothing to do with Naomi. Correct, Judge. And he also agrees to abide by all statutes and everything in which deal with this issue. Which made him jointly and severally liable. But if you drill down further on the statute, this 14025, which… I don't see how you get around the joint and sever liability. But why would you have a statute 14025 which says that the provider is liable for payments made to him? Why would you have a specific statute that would then be overridden by a general… I don't see how they would be overridden. I mean, you could read them in conjunction with each other. I don't see how they conflict. They do, because in this situation, the 14025 is a payment made to the provider. He never got a payment. Later, that was changed, a payment made to a provider or on his behalf, but that's a different time period. So they do conflict, because he never got the payment. Now, I could see if he had been submitting bills and had cooked the books, then sure. Sure, he's liable for that. But when somebody else is preparing the bills, sending them off, taking the money, paying him a salary, that's a difference there. Well, is there any distinction, though, in the regulations? Yeah. If you read 14025, it doesn't. In fact, the state changed it, maybe to address this very issue. Are you talking about 140.25? Yeah. Okay, because that doesn't have anything about any distinction. It just says when the department's provider or the designated alternate payee has determined that an overpayment has been made, the provider or the alternate payee shall reimburse the department for overpayment. The department shall recover overpayments made to or on behalf of the provider that result from improper billing practices. I'm not sure. Am I reading something else? You might be looking at the new one, Judge. Well, I'm looking at 140.25. Okay. What part of the record are you looking at it in, Judge? I'm reading from the code. Okay. Because there's a previous version that was no longer in effect. And that one, the 140.25 I'm looking at doesn't refer to alternate payees nor does it have the language saying that payments made to the provider or on his behalf. It just simply says payments made to the provider. And that may have all been changed and cleaned up as time progressed. He's a provider. I don't know what we're – The payments were made to him. No, they were made on his behalf, though, weren't they? Correct. But that language only came into play in a later version of the statute. All right. You know, so your argument would be that in order for them to recover any of this money from your client, they would have to establish that he actually got the money. No, or that there was a valid alternate payee agreement that the money should have been flowing out. How do you distinguish this case from the First District case? Which one, the LaBeo? Yes, versus the Department of Public Aid. Well, there's – the doctor himself was not receiving payment. It was through a practice, and he was employed by the practice, and the practice was billing. I think the fundamental distinction between that case and this case, Judge – and, again, there were some cases early on where people were fighting over the constitutionality of this. This is post-constitutionality. Right. Post, after there had been claims that the statute was unconstitutional. The single difference between this case and LaBeo, Judge, and the most important one is that in LaBeo, the state never said that the alternate payee agreement was invalid. No one ever raised that argument. There's never any issue, and I believe that that attorney – that case references the doctor, a valid APA, and that he also submitted that power of attorney, which the alternate payee requires. That's the distinction between this case and LaBeo. Except that you haven't been able to show me today where this alternate payee agreement is part of the obligation. Somehow, if you don't have a proper APA, you can't seek overpayment. The department is somehow hamstrung by this. There's – I'm still looking for the section that you were saying regulates this so that he's off the hook. I would just – I would – I mean, if you – there's a couple things. First off, it's a general assignment or a legal rights provision. If there's no agreement from the doctor giving somebody the authority to submit his bills, there's no legal right for the entity to do it. Until a party affirmatively assigns a right to a third party, there's no – Well, what did he do with them? Yes. What did he sign? He signed nothing? He signed the APA agreement. Okay, but so then what do you say? I'm saying that, A, the state said – The APA agreement wasn't valid? The state said it wasn't valid. They made that statement in the proceedings below. And if you look at the facts, an APA has to be a hospital, a group practice, a training facility. There's three or four or five sub-requirements for an entity to be a valid APA. In other words, not every type of medical provider would have been a valid APA party. And so, yes, it wasn't one of these entities, and the doctor never signed the power of attorney. So for those three reasons, these bills submitted to the state were a nullity or dead on arrival. Is that your brief? Yes. What page do you say that? Well, the section on the power of attorney. I know you argued they were inconsistent and that they should be traditionally staffed. Plaintiffs cannot be held liable for the improper billings of yes when there are no grounds upon which yes could properly bill for his services. And then we break that down by saying that the state argued that the APA was invalid. So they should be staffed from claiming liability on it. And we further say that even if that hadn't happened, the yes was not a proper recipient of the APA and that the doctor never signed the power of attorney. So that's pages approximately 19 to 22 of the brief. All right. On your extrapolation argument, the 5th District case you rely on, there was an expert in that case. Yes. We have no expert, Judge. That's exactly right. And the state points that out in their brief. We have no expert to submit testimony. In this case, the same doctor appeared to me to be the same or relatively the same type of examination that he did there. And in this other LeBeo case, the court clearly held that the extrapolation method, that there was nothing improper about that. So between the two cases, one, the 5th District, they did call an expert. You did not or whoever represented the doctor. So are you conceding that the extrapolation method here was not, was all right? No, Judge. And to hazard a guess, Judge, I apologize, but LeBeo, I feel, I don't, if it addressed, I don't know that it held that extrapolation was valid. I don't recall that being an issue in the case. I recall that more being the doctor saying they never should have put these bills out on behalf. I didn't know what was going on. And it could be wrong, Judge, but I think we looked at this and at the time the only case that really talked about this extrapolation was the Protestant Memorial case from downstate. And it was the same doctor, Dr. Nassari, and actually the same, I believe the same auditor, Hope Little. Well, I guess they just referred to the fact that in that case, the bills were extrapolated using the method that this doctor used. That may be the case, Judge, but I don't know the doctor made the argument that they shouldn't have been extrapolated. And frankly, Judge, although I would love to see this case reversed and judgment removed against the plaintiff, my arguments on this extrapolation, we went on it, that reduces the judgment from $640,000 to $295,000. That's an alternate request that I'm making. It doesn't get the doctor out of the woods by any stretch. But I do think there are grounds to reduce the damages if the court is not willing to negate the liability in its entirety. We are reviewing this under a clearly erroneous standard, are we not? For the issue of judicial estoppel, I think everything else, Judge, I think that we don't really have an issue of somebody was saying the car was red, somebody was saying the car was blue. I don't think we're really too much on the facts. I think it's really, did the court apply the law properly? Under which issue? The issue of liability. If you move past the promissory estoppel issue, whether or not the AP was even valid to be executed in the first place, the lack of a power of attorney, that would be under the… Don't we give deference to the agency in interpreting its own rules? Sure, Judge, but it's not under clearly erroneous. It would be… Clearly erroneous is where you have facts and you're applying them to a particular regulation or statute. And unless we find that there's a clear error or that it's obvious that the department made an error, the facts are taken as true. Correct. And we do give some deference to the agency interpreting its own regulations. Well, Judge, I don't know. I mean, the cases, there's the city of Chicago case we have in our brief that says that if you're talking about somebody interpreting a statute or an administrative code provision, that that's no… Not when it's an agency interpreting its own regulations. I mean, there may be a little bit of a higher deference to the judge, but it's certainly not. It's going to be below the clearly erroneous, which we have to overcome for the estoppel argument. I'm still trying to figure out how you get around the provider agreement that the doctor signed with the department. Forget about whether the alternate payee agreement was valid or invalid. What difference does it make? The ultimate liability seems to me, because based on the agreement that he reached with the department, that is your point. Well, Judge… That he agrees to be fully liable to the department for any overpayments which may result from the submit of the billings to the department, whoever submits it. Well, let me… They used his provider number. Let me point out one sentence. And he doesn't deny that. I'll point out one sentence in the provider agreement that he signed, his participation agreement. It says that he's fully liable to the department for any overpayments which may result from the provider's submittal of billings to the department. You know, the language, the provider's submittal of billings. Again, he didn't submit the bills. But it doesn't say that. I'm looking at the record at 2085. I mean, these are, not to downplay, but these are big books and they say lots of things. And once you drill down to the specific acts of the billing, it does have the language saying that results from the provider's submittal of billings to the department. This is page 2085 in the record. Yeah. So then he's not… Aren't you then essentially saying he's not liable for anything? Yeah. And you're suggesting that the administrative law judge's decision, which omitted some language from the provider agreement. Because I was quoting from the administrative law judge's decision. Well, Judge, let's look at it. Take a look at page 25 of Exhibit C in your brief. Have you got it? Yeah. Page 25, paragraph 12 up at the top. The provider agrees to be fully liable to the department for any overpayments which may result from the submittal of billings to the department. It doesn't say anything about his submittal of billings. It just says submittal of billings using his provider number, I would assume. But you say that the actual agreements inserts the word submitted by the provider? Yes, Judge. I'm just reading. At 2085 in the record? Yeah. I'm sorry, Judge, I'm still not at the page that you were at. So I would like to address that point. It's in your brief, in your appendix. I'm sorry. Under your exhibits. It's under Exhibit C, the tab for Exhibit C, which is the actual administrative law judge's recommended order. Are you on the page, Judge, that has paragraphs 7, 11, and 12 at the top? Correct. Okay. May I again? I'm sorry, Judge. Which section are you looking at? Paragraph 12, for example. Paragraph 7 is pretty straightforward, too. No, Judge, I agree. I mean, I see the language. Yeah. I mean, these agreements seem to say more than one thing. That's provision. You know, I think if you drill down to that further language that says that, you know, the 2085 for payment submitted, you know, by the provider, you know, again. Where is the agreement, where is that particular provision? I'm not sure, Judge. I'm just reading a quote of it from the record. I mean, if, in fact, the department is editing the agreement that he signed, that the provider signed with the state, you may have a point. I don't know. I'm just assuming that when he puts things in quotes as he did. I'm not suggesting that the state altered or shorted the material. I'm suggesting that it says that. But then on that other section, it says that the provider's responsible for bills submitted by him. So I'm saying I don't know where that leads. Maybe the Attorney General can clear it up and ask him when he gets up. Yeah, and, again, I don't mean to suggest that the state was eliminating or altering the law. That's not my point. Okay. We'll give you an opportunity to respond after we've heard from the AG. Okay, thank you. You bet. Mr. Turner, good morning. Good morning, Your Honor. How are you? Have you been here before, this court, before? I have been before another division of this court before. But not this division. I didn't recognize you. I wasn't sure whether I knew you or not. Anyway, you're the AG in this case. I am, Your Honor. We're representing the department and its director. As you usually do. Your Honor, under the department regulations and under his provider agreement and the appellate court precedent in the Lebeco case, Dr. Fernando is liable to the department for the overpayments under his provider number and in his name, regardless of whether or not he used his employer. Is there a discrepancy in some of the language with respect to the provider agreement? Actually, I believe the counsel is correct that there is somewhere else in the provider agreement. There's a separate paragraph which says that he is responsible. He will be liable for bills submitted for the provider, for the submittal of bills by the provider to the department. However, in Paragraph 7, as you pointed out, it very clearly says that he is generally just liable for any bills submitted. All claims submitted electronically. All claims. So regardless of whether or not in a later paragraph there is a specific statement, somewhere in one of those paragraphs, it's not surprising that they would also have another paragraph which says, by the way, you're also responsible to be accurate in your billing. When it prevails, he says, no, you are liable for all bills submitted to the department, period. It's a broad statement. Well, why would it say one thing in one place and then limit it in another? Well, it's not limiting in the other. It's just going through and making a point that he's, it's just going through it and broadly describing his liability and his responsibility. It also goes down to he's liable for any kind of payments or overpayments, erroneous payments or improper payments. The fact that they're going to, that would still also over, it would still be an overlap between that liability and the liability for improper billing. So you're suggesting that basically what he's saying is that the state is in agreement with making him absolutely liable for any payments doled out by the department when his provider number is being used. Yes, Your Honor. Even if he's unaware. It's his responsibility to keep track of things like that. It is, Your Honor. And that's, that this Court recognized previously in the Lebecco case that the whole Medicaid program rests on the cornerstone of the medical provider being the steward of his provider number and the bills and the records that support those bills. They rely on him to police his records to take ultimate responsibility. When he does it, when he just accepts his salary in exchange for his, for that salary and in exchange for his position. The use of his number. He, in providing his number, he, that, he provided the number. And he consented in the, and acknowledged in the APA agreement that he signed, twice actually, he signed it twice with yes, that he would be responsible for any bills submitted to the department, even though in his name by the alternate payee, alternate payee, and that he acknowledged that we would pay, the department would pay the alternate payee, yes, on his behalf. Now this is consistent, this liability is consistent with his liability under the regulations, in the code, under 140.15 and 140.28. Those were the provisions that he was held by before violating. Those are the provisions which broadly state that we can recover, we can recover any overpayments made, period. And that's been, as this Court recognized in the Lebecco case, that's because that's the framework of the system. Now we don't have, you do not have to reach the outer contours of how far this absolute liability goes. This is not a case where some secret third party came in, snuck into Dr. Fernando's office, stole his provider number, and was secretly billing somewhere else. No, that would be a different case. It was a different case. He admits, he does not deny that he executed this and willingly executed this. He authorized them to use his number. He did.  acknowledged that they would receive payment for the number. And not only that, but he further, he testified below, and apparently his defense below is based on, was that even though all, as he testified practically all of his patients, the wards of the state would yes, and was he conditioned from doing it, that he took no oversight of the billing whatsoever. He had no participation whatsoever. He just checked out. He abdicated that role of taking any responsibility for his provider number and the bills in his name. What about his complaint about the alternate pay agreement, that it's missing or absent? Well, depending on which position you take. That makes some difference. Well, he doesn't say the alternate pay agreement is missing. He's saying that it's invalid. It was an invalid. Right. First of all, we don't think it was invalid. Second of all, there was an argument below made about the invalidity of it. It was never an argument that he wasn't bound by it. However, our first argument is, as I said before, under the regulations and under the code, he is liable regardless of having an alternate pay agreement. Right. What you're basically arguing is that whether there was an APA or whether there wasn't an APA under the provider agreement that he signed with the state, he's liable. Yes. That is our position. Now, even if it had some, I'm sorry. Go ahead. There is no regulation that suggests that there has to be some valid alternate pay agreements in place in order to go after the provider. No. Correct, Your Honor. There is no such issue. There's nothing at all. Now, even now, what happened was, in just the way the regulation goes in the framework went, before 2007, the regulations did not directly regulate the alternate payees at all. And that was consistent with the regulatory framework. The provider took more ultimate responsibility. Now, after the hearing in this case around 2006, the code, actually the Act itself, Section 12-4.25, was amended in order to explicitly regulate alternate payees. And then, in turn, in January of 2007, the Department amended its regulations, in which it basically explicitly governed and regulated the alternate payees so that they had the option of bringing them in as defendants, as joint and several defendants. And that's the point below. The argument that there was something defective about the alternate payee agreement, that was an argument having to do with whether or not the Department even had the authority or their jurisdiction to have a claim in the administrative proceedings against the alternate payee when they weren't governed or referenced in the regulations at that time. That was our argument, and that was the problem. Now, what happened was, in the course of making that argument, that a counterargument was made, I think actually the ALJ said, well, what about the sign of the ALJ agreement? Yes, sign this alternate payee agreement. Doesn't that provide you with jurisdiction? Now, it didn't because that just speaks to their liability to us, not our jurisdiction to proceed against them within the administrative proceedings. And, indeed, even though in response the argument was made that, hey, they didn't really fit within the framework of the three parties that are identified within the agreement, that it might be invalid, our argument, though, was, hey, we're not saying that neither Dr. Fernando or, for that matter, yes, still could be liable under this contract, and we can still not proceed against them under it. We always had the position consistently that we still could. But Jennings was brought in. She was subpoenaed. She testified. She was cross-examined, wasn't she? Correct, Your Honor. She was.  He took written discovery. He was able, then, to have her at the hearing. Actually, four days of the hearing, I think, was the examination and cross-examination of Naomi Janes. What about the judicial estafa argument? Yes, Your Honor. That's what I was speaking to before. As I said, first of all, there was not an inconsistent position. We always took the position below that both Dr. Fernando and, for that matter, yes, were still liable under the agreement to us. The only position that was taken was, as I said, in response to the argument that somehow the alternate payee agreement would subject, yes, to the administrative jurisdiction of the department, that they said, well, no, the counsel said, there might be something defective about this because they're not a hospital. They're not a group practice. Now, that doesn't still mean they even, the department doesn't actually believe now that that would actually render invalid. But even if it did, it would only have a problem between the agreement between Dr. Fernando and yes, which that's what the agreement is between. In the agreement, they still, not only did they still acknowledge, not only did Dr. Fernando acknowledge that he would be liable for the bills, that the department would pay yes on his behalf, but he was the one who represented. He signed it and represented. The statement is, I am an employee of a hospital or a group practice. He was the one who represented that to the department. The notion that he could actually get a liability by misrepresenting information to the department. When the legislation was changed and then the regulations to reflect that the department could go after an alternate payee, there is really no other change. Is there? I mean, all it does is say that they're jointly, they can be both held jointly and severally liable for any overpayments, over billing made to the department. Correct, Your Honor. All those changes were a clarification of the laws the way the department saw it, but it did provide administrative jurisdiction so that we now have the option of going after them within these administrative proceedings. I mean, in the Leveo case, wouldn't you agree or would you say that the employer was basically an alternate payee in that case? Not just basically. He was an alternate payee in that case. The court references in the decision that there was an alternate payee agreement between the doctor and his employee, that group practice. There was an APA in that agreement. Now, the decision, however, doesn't rest the doctor's liability on that case. First, it goes through, it says the code, the regulation, and the handbook. That's how he's liable. When it discusses the alternate payee agreement, it says, yes, and that was yet another way, and it says very explicit, it provided notice to the doctor. In the agreement that he signed, he had noticed that, hey, no, you are really ultimately responsible, and that's the exact language used. That's what it provided. It doesn't say that that was the basis of his liability. That's exactly the same issue here. I mean, the same facts are here that certainly Dr. Fernando had notice of his liability provided by his agreement. In that case, the doctor was terminated from the program. Yes, he was also, in that case, he was appealing, like Dr. Fernando here, both his termination and an overpayment, and a liability for overpayment in that case. And also, like Dr. Fernando, there was no suggestion that he was involved in any sort of criminal fraud or active fraud. That's not what this case is about. It's not about whether he joined Ms. Jennings in her criminal fraud and theft. It's about his violations of his own responsibilities, his own duties under the law, and his abdication of that will, Your Honor. Anything else? Do you want to sum up? Yes, Your Honor. And so for these reasons, and I don't know if you want to speak to the extrapolation at all, Your Honor. No. Neither do I. Thank you, Your Honor. And for these reasons, and for the reasons in our brief, we asked the court to hold Dr. Fernando liable for his overpayments and further terminating him from the program. Thank you. Mr. Driscoll, a final word. Thank you again, Chairman Driscoll, for the record. You know, just to sum it up here, the State below said the APA was invalid. This should be held to what they said below. You know, it seems that we're kind of broadening what the liability is here and downplaying the importance of this alternate provider agreement and its validity. You know, if we remove the APA, and, Judge, I know there's no statute to it, Judge McBride, and I wish there was, but there's not. But, you know, if we remove the necessity of that APA, then what's to say that a doctor is responsible, you know, if Northwest had submitted a bill on Dr. Fernando's behalf? Well, apparently that's what he agrees to when he signs the agreement with the department as a doctor. I don't think anybody would agree to be responsible for bills that weren't submitted properly. I mean, if somebody stole his number and submitted the bills, I don't think that's where they want the suit to go. I think they want it to be, you know, when a doctor properly gives that right to somebody else, that he be on the hook for it. You know, but again, you know. It would appear to be almost an absolute liability agreement that he enters into with the state in exchange for the right to receive money from the state for his services. Yeah, it can be. But that's all I have, Judge. I give the remainder of the time that I have to the court. Very good. Thank you. Thank you both. The case will be taken under advice.